UNITED TRANSPORTS, INC., Plaintiff,
v.
UNITED STATES of America and Interstate Commerce Commission, Defendants.
National Automobile Transporters Association, Intervening Plaintiff,
Heavy-Specialized Carriers Conference of American Trucking Associations, Inc., and U.S.A.C. Transport, Inc., Intervening Defendants.

Civ. A. No. 9601.

United States District Court
W. D. Oklahoma.

Dec. 27, 1962.

Wrape & Hernly, Memphis, Tenn., Mosteller, Fellers, Andrews, Snider & Baggett, Oklahoma City, Okl., for plaintiff.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger and Joel E. Hoffman, Attys., Dept. of Justice, B. Andrew Potter, U. S. Atty., Robert W. Ginnane, Gen. Counsel, James Y. Piper, Asst. Gen. Counsel, Robert S. Burke, Atty., I. C. C., for defendants.

Matheson, Dixon & Bieneman, Detroit, Mich., and Mosteller, Fellers, Andrews, Snider & Baggett, Oklahoma City, Okl., for intervening plaintiffs.

Ernest A. Brooks II, St. Louis, Mo., for intervening defendants.

Before HILL, Circuit Judge, and RIZLEY and DAUGHERTY, District Judges.

HILL, Circuit Judge.

This is a civil action brought under the provisions of 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325 and 5 U.S.C. § 1009, to enjoin, annul and set aside orders of the defendant, Interstate Commerce Commission (hereinafter referred to as the Commission), entered in Docket No. MC–C–1919, United Transports, Inc. v. Gulf Southwestern Transportation Company, and to compel action by the Commission alleged to have been unlawfully withheld by it upon the complaint in that proceeding.

The record discloses that the plaintiff United Transports, Inc., (hereinafter referred to as United) by virtue of certificate of public convenience and necessity issued in Docket No. MC–71902, is authorized to engage in the transportation, as a common carrier by motor vehicle, over irregular routes in interstate and foreign commerce, of:

"Automobiles, trucks, tractors, cabs, chassis, bodies, and parts thereof (when accompanying the vehicle for which they are intended), and automobile show equipment (when accompanying the motor vehicle), by driveaway and truckaway methods, restricted to secondary or subsequent movements,

"Between points and places in Missouri, on the one hand, and, on the other, points and places in Arizona, New Mexico, Oklahoma, and Texas."

Under a certificate of public convenience and necessity issued in Docket No. MC–106379 (Sub–No. 4), the Gulf Southwestern Transportation Company (hereinafter referred to as Gulf Southwestern) is authorized to engage in the transportation, as a common carrier by motor vehicle, in interstate and foreign commerce, of:

"Contractor's equipment and commodities, the transportation of which because of their size or weight requires the use of special equipment, over irregular routes,

"Between points and places in Texas, on the one hand, and, on the other hand, points and places in Ohio, and the Lower Peninsula of Michigan." [1]

The record further discloses that on January 26, 1956, United filed its formal complaint with the Commission [2] alleging that Gulf Southwestern was transporting certain United States Army cargo trucks from Toledo, Ohio, to Fort Bliss, Texas, without authority from the Commission to do so, in violation of Section 206(a) (1) of the Interstate Commerce Act, 49 U.S.C. § 306(a) (1). [3] United requested that the Commission issue an order requiring Gulf Southwestern to cease and desist from such transportation. Gulf Southwestern answered the complaint admitting the transportation of the vehicles in question but asserted that the transportation of the vehicles was within the scope of its operating authority as set forth in its certificate of public convenience and necessity.

1. This operating authority of Gulf Southwestern was transferred to the intervening defendant, U.S.A.C. Transport, Inc., subsequent to the effective date of the Commission orders here in question and such transfer has no bearing on the issues involved. Accordingly, our references in this opinion will be to Gulf Southwestern.

2. The proceeding was initiated under the provisions of 49 U.S.C. § 304(c).

3. This section provides, in pertinent part, as follows:

"Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operation on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: * * *."

The matter was referred to, and heard by, an Examiner of the Commission. The facts, as established by the evidence presented at that hearing, are not in dispute and may be briefly summarized. Prior to the time the complaint was filed with the Commission, Gulf Southwestern had participated in the transportation of the trucks in question which weighed approximately 19,800 pounds each and which were moving in interstate commerce from Allentown, Pennsylvania, to Fort Bliss, Texas. The trucks were moved from Allentown to Toledo, Ohio, by Howard Sober, Inc., (hereinafter referred to as Sober) a corporation engaged in the transportation of motor vehicles as a common carrier in interstate commerce under operating authority similar to that of United. The trucks were moved by Sober from Allentown to Toledo under their own power by what is known in the trucking industry as the "driveaway" method or service without the use of "special equipment" of any kind. Sober turned the trucks over to Gulf Southwestern at Toledo, Ohio. It proceeded to load the trucks on flatbed trailers and transport them to Fort Bliss by what is known in the industry as the "truck-away" method or service. The trucks were loaded in Toledo by driving them up a permanent ramp onto the flatbed trailers, without the use of special equipment, and, upon arrival in Fort Bliss, were unloaded by driving them off of the bed of the trailer down a permanent ramp, again, without the use of special equipment.

The Commission's Examiner, in his report, found that the loading and transportation of the vehicles in question did not involve or require the use of "special equipment", that consequently it was not within the scope of Gulf Southwestern's operating authority and that Gulf Southwestern had, therefore, engaged in unlawful transportation in violation of 49 U.S.C. § 306(a) (1). The Examiner recommended that an order be entered requiring Gulf Southwestern to cease and desist from such unlawful operation, and it filed exceptions to the Examiner's report. Thereafter, the intervening defendant here, the Heavy-Specialized Carriers Conference of American Trucking Associations, Inc., (hereinafter referred to as the Conference) was permitted to intervene in the proceeding and filed its exceptions to the Examiner's report. United filed a reply to both of these exceptions.

Upon due consideration, Division 1 of the Commission, issued its report and order [4] in which it adopted the Examiner's findings of fact, with some amplification, but disagreed with his conclusions and dismissed the complaint. In its report and order, Division 1 found that the transportation of the trucks did not require the use of "special equipment" but held that since each of the trucks weighed in excess of 15,000 pounds, the transportation thereof by Gulf Southwestern was within its operating authority as a "heavy-hauler" under the so-called 15,000-pound "last-resort" test announced by the Commission in Dallas and Mavis Forwarding Co., Inc., Ext.—Galion, Ohio, 79 M.C.C. 285 [5] and W. J. Dillner Transfer Co.—Investigation of Operations, 79 M.C.C. 335.[6]

In due course, United filed its petition for reconsideration of the matter by the entire Commission, to which Gulf Southwestern and the Conference responded. The matter was re-opened and the full Commission, after reconsideration on the present record, issued its report and order.[7] In such report and order the Commission, with one member dissenting, affirmed the report and order of Division 1 and dismissed the complaint on the same grounds, i. e., on the basis of the so-called 15,000-pound "last-resort" test.

---

4. United Transports, Inc., v. Gulf Southwestern Transportation Company, 81 M.C.C. 1.

5. Hereinafter referred to as the Dallas & Mavis case.

6. Hereinafter referred to as the Dillner case.

7. United Transports, Inc., v. Gulf Southwestern Transportation Company, 84 M.C.C. 565.

United then commenced this action to review the decision of the Commission wherein it seeks the relief heretofore related. By order of Judge Rizley of this Court, the National Automobile Transporters Association (hereinafter referred to as the Association) was permitted to intervene in this proceeding as a party plaintiff and it filed a complaint seeking the same relief as United. The defendants responded by filing joint answers to the complaints of United and the Association. In their answer to the Association's complaint, the defendants allege, among other things, that the Association "was not a party to the proceeding here under review" and its complaint should be dismissed. Subsequently, the Conference and U.S.A.C. were permitted to intervene as parties defendant to this action. With issues thus joined, the matter proceeded to hearing before this Court.

At the outset, we are confronted with defendants' objections to: (1) The intervention of the Association as a party plaintiff; (2) the admission into evidence of Plaintiff's Exhibit 2; and (3) the admission into evidence of Plaintiff's Exhibit 3.

■ The defendants appear to base their objections to the intervention of the Association on the ground that it was not a party to the proceeding before the Commission. They also point out, and correctly so, that, under the provisions of 28 U.S.C. § 2284, the action of a single Judge of this Court, such as permitting the intervention here in question, is reviewable by the full Court. We must, therefore, determine whether it was proper to permit the Association to intervene in this proceeding. Such a determination is governed by 28 U.S.C. § 2323, which, in pertinent part, provides as follows:

> "Communities, associations, corporations, firms and individuals interested in the controversy or question before the Commission, or in any action commenced under the aforesaid sections may intervene in said action at any time after commencement thereof."

We think it clear from this language of the statute that the Association may properly be permitted to intervene in this action, and, accordingly, defendants' objection thereto is overruled.

The defendants' objection to the admission into evidence of Exhibits 2 and 3 is on the basis that to admit such exhibits would be a violation of the rule prohibiting a trial *de novo* in this Court. American Trucking Assos. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337; National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344. Since we reach different conclusions with respect to each exhibit, they will be discussed separately.

■ Exhibit 2 is an affidavit by the Association's traffic manager identifying a number of its members, including United, as being carriers holding authority to transport motor vehicles and who will be affected by the decision herein. This exhibit is offered for the sole purpose of establishing the interest of the Association in this proceeding and not to supplement the record before the Commission in order to secure a trial *de novo*. We believe the exhibit is admissible for that limited purpose, and that purpose only, and therefore defendants' objection to its admission is overruled.

■ Exhibit 3 is a certified copy of Tariff No. 1–G filed with the Commission and published by the Conference which shows, among other things, the carriers participating in the Conference, their operating authorities and further, that the operating authority of each and every one of such carriers is limited to the transportation of commodities "which because of size or weight require special equipment." It does not appear from the record that the contents of this exhibit were called to the attention of, or considered by, either the Examiner, Division 1 or the entire Commission. Nor do we consider that it has any materiality or bearing upon the issues presented. For these reasons, the defendants' objection is sustained and the exhibit will not be received.

This Court is, of course, aware of the rule that the scope of judicial review of Commission orders is very limited. As stated by the Supreme Court in United States v. Pierce Auto Freight Lines, 327 U.S. 515, at page 536, 66 S.Ct. 687, at page 698, 90 L.Ed. 821:

"* * * The function of the reviewing court * * * is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

Or, stated in another way, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the Commission. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 287, 54 S.Ct. 692, 78 L.Ed. 1260. We are not concerned with the correctness of the Commission's reasoning or with any alleged inconsistency of its findings in other proceedings before it. Georgia Public Service Commission v. United States, 283 U.S. 765, 775, 51 S.Ct. 619, 75 L.Ed. 1397. And, the delineation of the services authorized by a certificate of public convenience and necessity as well as the interpretation of such a certificate is left to the Commission and its construction thereof is controlling on the courts unless clearly erroneous, arbitrary or capricious, an abuse of discretion or a violation of some established principle of law. Andrew G. Nelson, Inc., v. United States, 355 U.S. 554, 78 S.Ct. 496, 2 L.Ed.2d 484; Malone Freight Lines, Inc., v. United States, 107 F.Supp. 946 (N.D.Ala.) (1952), aff'd 344 U.S. 925, 73 S.Ct. 497, 97 L.Ed. 712.

With these general principles in mind, we turn now to a consideration of the determinative question before us, namely, whether under its certificate of public convenience and necessity authorizing it to transport, in interstate commerce, contractor's equipment and commodities "which because of their size or weight requires the use of special equipment", Gulf Southwestern could legally transport the trucks here in question in view of the fact that no special equipment was used or required.

The Examiner, Division 1 and the full Commission found and held that no "special equipment" was used or required in loading, unloading and transporting the Army cargo trucks and, in so doing, relied upon Clark Transport Co., Extension-Farm Tractors, 62 M.C.C. 555; Rowe Transfer & Storage Co., Inc., v. Malone Freight Lines, 54 M.C.C. 801; and Gallagher Common Carrier Application, 48 M.C.C. 413. For purposes of this case, we accept the determination that the ramps used in loading and unloading the trucks and the flatbed trailers are not "special equipment." However, contrary to the Examiner's recommendations, Division 1 and the full Commission determined that, regardless of all other considerations, Gulf Southwestern was authorized to transport the Army trucks solely on the basis that the trucks weighed over 15,000 pounds and therefore came within the rule announced in the Dallas & Mavis and Dillner cases. In support of this decision, defendants argue that the 15,000-pound "last-resort" or "first-resort" or "sole-resort" test is a "rule of thumb" or "interpretive decision" adopted by the Commission in order to more readily determine what shipments may be handled by the heavy haulers and it has a "rational basis" in that "the sheer necessity of having a rule of thumb, to apply with respect to the size or weight of unitized shipments authorized to be handled by a heavy hauler, by reason of the very fact that it is a heavy hauler, is sufficient justification for the establishment of the Com-

mission's 15,000-pound interpretive rule."

United, on the other hand, contends that, under the guise of interpreting the certificate here in question and by applying the 15,000-pound rule, the Commission has enlarged the operating authority of Gulf Southwestern without complying with the provisions of 49 U.S.C. §§ 306 and 307 and that there is no evidence in the record to support the 15,000-pound test but, rather, it is arbitrary and capricious, without foundation in fact or substance, and is in violation of established principles of law. United then argues that the report and order of the Commission is, therefore, arbitrary and capricious and the Commission acted unlawfully in excess of statutory authority and its report and order should be set aside and held to be a nullity.

Historically, common carriers of motor vehicles and the heavy hauler motor carriers have constituted two separate and distinct segments of the motor carrier industry. This distinction was recognized by the Commission as early as August, 1937, in Ex Parte Docket No. MC–10, Classification of Motor Carriers of Property, 2 M.C.C. 703, wherein 17 different classes of property carriers were identified, including "carriers of motor vehicles" and "carriers of heavy machinery."

At pages 711 and 712 of the report, the Commission defined "carriers of motor vehicles" as follows:

"This group consists of motor carriers engaged in the transportation of new and used motor vehicles, including automobiles, trucks, trailers, chassis, bodies, and automotive display vehicles, wholly or partially assembled, in interstate or foreign commerce. In this group are included:

"(a) Carriers engaged in the transportation of motor vehicles by truck-away method, involving the use of special equipment such as trucks, tractors, trailers, semi-trailers, 4-wheel trailers, tow cars, wrecking-service cars, and various combinations of the above in or upon which such motor vehicles are loaded.

"(b) Carriers engaged in the transportation of motor vehicles by drive-away method, involving the utilization of the motive power, in whole or in part, of the vehicles being transported, either in single drive-away or in combinations of two or more vehicles by use of tow-bar mechanism, saddle or bolster mount mechanism, full-mount mechanism, or any combinations of the above.

"(c) Carriers engaged in transportation of motor vehicles, within the boundaries of a city or single commercial zone, by either truck-away or drive-away method, where such transportation is a part of and is incidental to an interstate shipment or a movement in interstate or foreign commerce.

"NOTE—The transportation of new automobiles, trucks, and trailers is usually a class C–9 movement. The transportation of used automobiles, trucks and trailers and new or used chassis, bodies, and automotive display vehicles is usually a class D–9 movement. In either case, the operation may be that of a common or contract carrier. When classified as a class D–9 movement, the scope of the operation is territorial in character and includes the transportation of motor vehicles to, from, and between unlimited points of origin and unlimited points of destination within the territory served by such carrier, over irregular routes, in either direction, outbound, or back haul, or in cross movements."

The Commission, at page 710, defined "carriers of heavy machinery" which later became the heavy haulers, as follows:

"This group includes carriers, both common and contract, engaged in the hauling of heavy machinery and equipment, including road ma-

chinery, structural steel, oil-field rigs, and oil-field equipment.

"NOTE—These commodities are grouped together because of the equipment required and the nature of the service performed. The territorial scope of the service is usually similar to that of the household-goods carrier described above. Certain auxiliary or accessorial services are also performed in the transportation of these commodities, such as the dismantling and resetting of machinery, often requiring the use of rigging, skidding, and similar devices. A carrier of this class may find that all of his facilities are employed for a considerable period of time in a locality which is only a part of the territory in which he is authorized to serve. This type of carrier is usually a class D-3 operator. The movement involves and embraces the transportation of heavy machinery and similar equipment to, from, and between unlimited points of origin and unlimited points of destination within the territory served by such carrier over irregular routes, in either direction, outbound, or back haul, or in cross movements."

The distinction between the classes of carriers was again recognized by the Commission in Ex Parte Docket No. MC-45, Descriptions in Motor Carrier Certificates, 61 M.C.C. 209, which was a proceeding instituted by the Commission upon its own motion for the purpose of determining "if there should be established commodity lists under class or generic headings, and if so, whether such classifications and descriptions should constitute a guide in the interpretation of class designations and other terms used in certificates issued in accordance therewith." (61 M.C.C. at page 213). The Commission stated, at page 213, that "some of the generic terms or group classifications suggested or presently employed in certificates are not susceptible

of being reduced to a list of commodities and consequently the most that can be accomplished in those instances is to describe the commodities in terms of service." This the Commission did.

In connection with the "carriers of motor vehicles", it was stated that "The transportation of motor vehicles is either by the truck-away or drive-away method" [8] and that generally speaking automobiles and lightweight commercial vehicles were transported by the truck-away method, whereas, heavy duty commercial vehicles were transported by the drive-away method, which also included a heavy movement of military trucks. The Commission concluded (61 M.C.C. at pages 238–239):

"* * * that the term 'motor vehicle' is not a proper classification heading or generic term; that the term includes numerous types of vehicles propelled or drawn by mechanical power; that a number of such vehicles are of such construction as to be properly embraced within the term 'heavy and cumbersome machinery'; that the transportation of automobiles, trucks and busses is a specialized service which has settled into a fixed pattern; that the automobile hauler has in the past rendered that service; that the transportation of any motor vehicles other than those set forth in the next paragraph by automobile haulers has been the exception and not the rule.

"We find that the class heading 'Automobile trucks and busses' and the following lists of vehicles, namely, passenger automobiles (including jeeps), ambulances, hearses, and taxis, new and used, finished and unfinished, freight automobiles, automobile chassis, trucks, truck chassis, truck trailers, trucks and trailers combined, busses, bus chassis, and automobile show paraphernalia, equipment and supplies will be a just and reasonable class heading and list of the vehicles embraced

8. 61 M.C.C. at page 232.

within that class heading; and that future certificates shall specify whether the service is drive-away or truck-away, or both, and whether the service is in initial or secondary movements, or both, and shall speci fy that the authority to transport the vehicles under the above generic term includes authority to transport parts and accessories at the same time and with the vehicle of which they are a part and on which they are to be installed." [9]

With respect to heavy haulers, the Commission had this to say at page 248:

" * * * The commodities transported by this group of carriers generally are of such size or weight as to require special devices for their loading and unloading and the use of special equipment for their movement over the road. The commodities or articles do not follow any fixed pattern or fall into a generic classification or group as has been the case with some of those previously discussed. The heavy haulers and riggers transport and hold themselves out to transport every kind of commodity, the basic requirement of which is the use of special equipment or special handling. It may vary from a heavy piece of machinery to a huge girder."

And, further at page 251:

"The commodity description should be within the scope of the service which the heavy haulers have in the past held themselves out to perform but not as broad as that of a general commodity hauler. That is to say, no limitation should be made by listing the commodities they may handle. These carriers should be authorized to handle all commodities, the transportation of which requires the utilization of the peculiar service they offer to the public.

"We find that the commodity description and class heading 'Commodities, the transportation of which because of size or weight requires the use of special equipment, and of related machinery parts and related contractors' materials and supplies when their transportation is incidental to the transportation by applicant of commodities which by · reason of size or weight require special equipment' will be a just and reasonable classification or grouping of the commodities embraced therein."

Consistent with its findings and pronouncements in the Classification and Descriptions cases, supra, the Commission has uniformly held in particular cases coming before it that the heavy haulers are restricted in accordance with their certificates to the transportation of commodities, .which because of their size or weight require special equipment in the loading, unloading or transporting of such commodities. See, e. g., Black—Investigation of Operations, 64 M.C.C. 443; National Automobile Transporters Assn. v. Rowe Transfer, 64 M.C.C. 229; Johnson Common Carrier Application, 61 M.C.C. 783; St. Johnsbury Trucking Co., Inc., Extension—Heavy Hauling, 53 M.C.C. 277; Gallagher Common Carrier Application, 48 M.C.C. 413. There has, however, developed a "twilight zone" within which the same commodities may properly be transported by a general-commodity carrier which is subject to an exception of commodities requiring special equipment, and a heavy hauler authorized to transport commodities requiring special equipment. In the Rowe Transfer case, supra, at page 238, the Commission in discussing the subject stated:

"Thus the authorized scope of a heavy-hauling service extends to and includes some commodities which may likewise be transported by carriers engaged in another type of service, but only when they are such

---

9. It will be noted that United's certificate as a common carrier of motor vehicles substantially conforms to this finding and of particular note is the fact that United is authorized to transport trucks by both drive-away and truck-away methods.

as to 'require' special equipment for loading, unloading, or transportation. Moreover, the required special equipment or special handling means something more than the equipment and methods ordinarily used in securing loads on flat-bed trailers, as indicated in the Malone case, and more than the mere furnishing of trained drivers in either truckaway or driveaway operations as special handling."

And, in the St. Johnsbury case, supra, at page 297, it was said:

"It is quite apparent from the cases that the term 'special equipment' has been used in certificates to designate or describe a special type of service and as to the heavy haulers is significant in indicating the type of commodity offered and shipped by persons who require their special service. The phrase 'commodities which because of size or weight require special equipment and all related machinery parts and related contractors' materials and supplies when their transportation is incidental to the transportation of commodities which, by reason of size or weight, require special equipment' as already pointed out, enables the carrier authorized to transport such commodities to render a complete service in the particular field of transportation, but, by the same token, restricts such carrier from invading the field of another type of service. Thus when used as an exception in a general commodity or other type of authority the intent is to prevent that carrier from invading the heavy-hauler type of service. But in neither instance was it intended to prohibit the transportation of specific commodities which might

rightfully fit either type of service and there naturally is an overlapping of commodities which as a practical matter move in either or both types of service. * * *"

It is therefore readily apparent from these Commission decisions, that the test in delineating the services authorized to be performed by a heavy hauler under its certificate of public convenience and necessity is whether or not special equipment is required to be used in the loading, unloading or transporting of the particular commodity in question and this is true even in situations falling within the so-called "twilight zone". In this regard, United contends that the Commission departed from such test in the Dallas & Mavis and Dillner [10] cases and in the case at bar by establishing the 15,000-pound rule allowing heavy haulers to transport single-item shipments weighing 15,000 pounds or more, which might be otherwise beyond the scope of their authority, regardless of all other considerations. United then argues that the effect of the 15,000-pound rule as applied to Gulf Southwestern's operating authority is to enlarge the scope of such authority without proof in accordance with 49 U.S.C. §§ 306, 307, that the public convenience and necessity require it.

As we have seen, our scope of review is very limited. Nevertheless, we are compelled to agree with United in these respects. Gulf Southwestern as a so-called "heavy hauler" is necessarily restricted by its certificate of public convenience and necessity to the transportation of "Contractor's equipment and commodities, the transportation of which because of their size or weight *requires the use of special equipment* * * *." (Emphasis supplied). In our opinion, the conclusion is inescapable that the 15,000-pound rule establishes a test different

10. The Commission's report and order in the Dillner case, supra, was reviewed by the court in W. J. Dillner Transfer Company v. I. C. C., 193 F.Supp. 823 (W.D. Penn.1961), aff'd, W. J. Dillner Transfer Co. v. United States, 368 U.S. 6, 82 S.Ct.

16, 7 L.Ed.2d 16. However, the validity of the 15,000-pound rule was not in issue in that proceeding and, accordingly, we must review it here without the benefit of prior court action thereon.

**44**

from that commonly applied in the past by the Commission and that it serves to enlarge the operating authority of Gulf Southwestern in a manner not prescribed by law. The Commission, itself, has held that it has no power to change, modify, revise or enlarge certificates except in keeping with the standards established in 49 U.S.C. §§ 306, 307 (Descriptions in Motor Carrier Certificates, 61 M.C.C. 209, 214; Modification of Permits— Packing House Products, 48 M.C.C. 628, 631) and we accept such determination as controlling law in this case.

Moreover, it seems clear to us that if the words "special equipment" as used in the certificate in question mean anything, and obviously they do, it is that Gulf Southwestern as a so-called heavy hauler is only authorized to transport commodities which require the use of special equipment. Here, no special equipment was used or required to transport the Army cargo trucks from Toledo, Ohio, to Fort Bliss, Texas. Accordingly, Gulf Southwestern does not possess the requisite operating authority and its transportation of such trucks was unlawful and in violation of 49 U.S.C. § 306(a) (1).

We conclude that the order of the Commission is clearly erroneous and in excess of the Commission's statutory authority.

United further argues that not only did the Commission act arbitrarily and capriciously and in excess of statutory authority but it also failed to comply with the requirements of Section 8 of the Administrative Procedure Act, 5 U.S.C. § 1007(b). We find much merit in this contention as well but, in view of our disposition of the case, need not discuss this aspect of it.

The Commission's order finding that the military cargo trucks of the type herein involved when transported in the manner indicated are within Gulf Southwestern's operating authority is, therefore, set aside and held to be a nullity and the Commission is enjoined from enforcing the same.