PITTSBURGH & NEW ENGLAND TRUCKING COMPANY and Ace Doran Hauling & Rigging Company, et al., Plaintiffs,

v.

The UNITED STATES of America and The Interstate Commerce Commission, Defendants.

Civ. A. No. 71–979.

United States District Court, W. D. Pennsylvania.

June 21, 1972.

Judgment Affirmed Oct. 16, 1972. See 93 S.Ct. 235.

Harry W. Miller, Royston, Robb, Leonard, Edgecombe, Miller & Shorall, Pittsburgh, Pa., John P. McMahon, George, Greek, King, McMahon & McConnaughey, Columbus, Ohio, Phillip Robinson, Robinson, Felts, Starnes & Nations, Austin, Tex., Robert E. Joyner, Wrape & Hernly, Memphis, Tenn., Paul F. Sullivan, Washington, D. C., Alan Foss, Van Osdel, Foss, Johnson & Miller, Fargo, N. D., James W. Hightower, Hightower & Alexander, Dallas, Tex., J. C. Waldman, U. S. Atty., Pittsburgh, Pa., Harry First, U. S. Dept. of Justice, Anti-Trust Div., Washington, D. C., for plaintiffs.

John A. Vuono, Wick, Vuono & Lavelle, Pittsburgh, Pa., Arthur J. Cerra, ICC, Office of the Gen. Counsel, Roland Rice, Rice, Carpenter & Carraway, Joseph G. Dail, Jr., Croft, Dail & Vance, Washington, D. C., John L. Bruemmer, Bieberstein, Cooper, Bruemmer, Gartzke & Hanson, Madison, Wis., for defendants.

Before ALDISERT, Circuit Judge, and DUMBAULD and TEITELBAUM, District Judges.

## OPINION

DUMBAULD, District Judge.

This is a suit (under 28 U.S.C. §§ 1336 and 2325) [1] before a three-judge court to set aside an order of the Interstate Commerce Commission.[2] The basic question at issue is whether the Commission acted validly when it interpreted a "heavy hauler's" certificate (which limits the holder's operating authority to transportation of "commodities which by reason of size or weight require the use of special equipment") as not permitting the transportation of articles which do not require special equipment by reason of their inherent or intrinsic characteristics or properties, but which (chiefly for reasons of convenience and economy) are tendered to the carrier by some shippers in aggregated packages or bundles which are too large or heavy for manual loading and are loaded by means of special equipment.

This is a very difficult, delicate, and doubtful question. At the one extreme it is clear, and admitted by plaintiff, that the mere fact that a large or heavy package of items which in their natural state obviously can be and customarily have been handled without the use of any special equipment (pencils and paper have been cited as examples) is tendered to a carrier should not have the effect of enlarging its operating authority. For such an extension of the carrier's certificated authority would have no limits; there is practically no commodity which (if enough effort were made) could not be packed in bulky and heavy packages requiring mechanical handling. As the Commission states, such an approach would amount to "an obliteration of any meaningful distinction" between heavy haulers and general commodities haulers. (108 M.C.C. at 733).

At the other extreme, "the purely theoretical possibility that a commodity can be handled through physical labor" by employing "robust individuals in sufficient number" does not suffice to withdraw from the scope of a heavy hauler's authority such a commodity when such primitive handling procedures are so irrational, inefficient and uneconomic as to "place them outside the realm of practical reality." (108 M.C.C. at 734).[3]

---

1. These sections carry forward the provisions of the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 219–220, requiring a three-judge court and abolishing the ill-starred Commerce Court, which had been established three years before. See Frankfurter and Landis, The Business of the Supreme Court (1927) 153–174. "The relation of the Interstate Commerce Commission to the courts has been one of the most intractable problems since the Federal Government embarked upon utility regulation." *Ibid.*, 154. Legislation has now been proposed and endorsed by the Commission but not yet enacted, providing for review of orders of this pioneer administrative agency by the Courts of Appeal, in accordance with the pattern now generally in force for review of other agencies [see, *e. g.*, 15 U.S.C. § 45 (c) with respect to review of orders of the Federal Trade Commission and 28 U.S.C. § 2342]. See 37 I.C.C. Practitioners J. (1970) 259–266, 1026–1029.

2. The order, dated April 22, 1969, was made in Docket No. MC–C–4 397, Ace

Doran Hauling & Rigging Co., Investigation of Operations, and is reported in 108 M.C.C. 717.

3. Such reliance on mere theoretical possibility of manual handling was the vice in the Commission's order condemned by this Court in Aero Trucking Inc. v. U. S., Civ.No. 64–413, where Judge Weber's opinion of January 11, 1966 (unfortunately not reported, but retrieved from the files in the Federal Records Center) said (p. 10): "We feel that in adopting a standard which uses the possibility that the ingots could be individually and manually loaded, the Commission has gone beyond the bounds of reasonable practicality." As the Commission accordingly held in Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91, 111 (1966): "any Commission determination that a given commodity is susceptible of handling manually should be premised upon record evidence showing that the commodity, in fact, has been or as a practical matter could be handled in that way; an abstract possibility of manual handling will not suffice."

How is the line to be drawn, and by whom? We conclude that an individual shipper (or heavy hauler) should not have the authority to enlarge a carrier's operating authority by the mere tender and acceptance of an aggregated shipment. Nor should the courts attempt to resolve an issue so imbedded in the area of transportation practices and considerations. The Commission is the appropriate agency to determine issues of this type, in the exercise of its "expertise" in the transportation field and of the regulatory powers conferred upon it by Congress. For reasons to be elaborated later, we also conclude that in the case at bar the Commission has made a conscientious and rational attempt to articulate the criteria for drawing the line where it did.[4]

In the case at bar it is of particular importance to note and heed scrupulously the time-honored precepts (ordinarily regarded as platitudes) delineating the limited scope of a court's power when reviewing an order of the Commission. The classical formulation in I.C.C. v. Union Pacific R.R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308 (1912), has been followed in a long and unbroken line of cases, which may be summarized by saying that the Commission's determination must be upheld if it is based upon substantial evidence and is not arbitrary nor erroneous as a matter of law.[5] "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 765, 83 L.Ed. 1147 (1939); Pittsburgh & L. E. R.R. Co. v. United States, 294 F.Supp. 86, 91 (W.D.Pa.1968). "The judicial task is to determine whether the Commission has proceeded in accordance with law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence." Penn-Central Merger and N. & W. Inclusion Cases, 389 U.S. 486, 499, 88 S.Ct. 602, 608, 19 L.Ed.2d 723 (1968).

It is clear that the Court is not free to substitute its own judgment for that of the Commission:

*The function of the reviewing court is . . . limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done.* Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the

---

4. The process of drawing a line by a gradual process of inclusion and exclusion is a familiar one. Davidson v. New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616 (1878); Irvine v. California, 347 U.S. 128, 143, 74 S.Ct. 381, 98 L.Ed. 561 (1954). For the often-quoted aphorism of Justice Holmes that the whole law depends upon differences of degree as soon as it is civilized, see LeRoy Fibre Co. v. Chicago, M. & St. P. Ry., 232 U.S. 340, 354, 34 S.Ct. 415, 58 L.Ed. 631 (1914). In Missouri, K. & T. Ry. Co. v. May, 194 U.S. 267, 269, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904), he said, holding that "the legislature is the only judge of the policy" to be applied, that "The question is whether this case lies on one side or the other of a line which has to be worked out between cases differing only in degree." And as he said in Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928). "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." See also the comments of Justice Frankfurter in Terry v. Adams, 345 U.S. 461, 472, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

5. See authorities cited in Lang Transp. Corp. v. United States, 75 F.Supp. 915, 926–928 (S.D.Cal., Central Div.1948).

reviewing court is without authority to intervene. *It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law.* [United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946), italics supplied]

The reason why these established rules are not mere platitudes in the case at bar, but constitute revitalized guidelines requiring most conscientious application, is that all members of the Court, if our personal philosophies and views of wise policy were to be given play, would feel sympathy for the position of plaintiffs.

On a humbler scale, this Court, in deciding whether the Interstate Commerce Commission has exceeded its lawful powers in making the order under review, is confronted with the same soul-searching predicament as the Supreme Court in deciding whether the Congress has exceeded its constitutional powers in enacting a statute. We must be equally alert to avoid substituting our own personal predilections or policy judgments for the commands of the law.

Perhaps no one has perceived this predicament more clearly, or expressed it more poignantly, than Mr. Justice Frankfurter.[6]

Dissenting in W. Va. State Bd. of Education v. Barnette, 319 U.S. 624, 646–647, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (1943), [which held the compulsory flag-salute in schools unconstitutional for Jehovah Witness children], he exclaimed:

One who belongs to the most vilified and persecuted minority in history is not likely to be insensible to the freedoms guaranteed by our Constitution. Were my purely personal attitude relevant I should wholeheartedly associate myself with the general libertarian views in the Court's opinion, representing as they do the thought and action of a lifetime. But as judges we are neither Jew nor Gentile, neither Catholic nor agnostic. We owe equal attachment to the Constitution and are equally bound by our judicial obligations whether we derive our citizenship from the earliest or the latest immigrants to these shores. As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard . . . It can never be emphasized too much that one's own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one's duty on the bench.[7]

It can not be denied that the assertions of the Department of Justice, on behalf of the statutory defendant the United States, which has confessed error in the case at bar,[8] are well-founded: the effect

6. See Philip B. Kurland, Mr. Justice Frankfurter and the Constitution (1971) 5 et seq.

7. Other cases where Justice Frankfurter emphasizes the importance of scrupulously excluding personal predilections from the judicial task include Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 267, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1947); Rochin v. California, 342 U.S. 165, 170–172, 72 S.Ct. 205, 96 L.Ed. 183 (1952); A. F. L. v. American Sash & Door Co., 335 U.S. 538, 555–557, 69 S.Ct. 258, 93 L.Ed. 222 (1949); Haley v. Ohio, 332 U.S. 596, 602, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 470–471, 67 S.Ct. 374, 91 L.Ed. 422 (1945);

Malinski v. New York, 324 U.S. 401, 417, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). See also Of Law and Men (Philip Elman ed. 1956) 40–42, 192.

8. This course is seldom, but sometimes, followed by the Department. See I. C. C. v. Mechling, 330 U.S. 567, 573, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); United States v. I. C. C., 337 U.S. 426, 429–432, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); American Commercial Lines v. Louisville & N. R. R. Co., 392 U.S. 571, 575, 88 S. Ct. 2105, 20 L.Ed.2d 1289 (1968); Ry. Labor Executives Ass'n v. United States, 339 U.S. 142, 146, 70 S.Ct. 530, 94 L.Ed. 721 (1950); Robert L. Stern, "'Inconsistency' in Government Litigation", 64 Harv.L.R. 759, 760–764 (1951).

of the Commission's decision under review is plainly anti-competitive. It will eliminate competition for certain traffic between heavy haulers and general commodities haulers. To an antitrust alumnus, favoring preservation of competition to the greatest possible extent even in regulated industries,[9] this argument has undoubted appeal.

■ But the conclusive answer is equally undeniable: under the regulatory statutes in force it is for the Commission, not the courts, to determine how much competition is desirable in the public interest.

■ Chesapeake & O. Ry. Co. v. United States, 283 U.S. 35, 41–42, 51 S.Ct. 337, 75 L.Ed. 824 (1931), long ago held that the Commission might authorize new service for the very purpose of promoting competition to the extent found by the Commission to be convenient or necessary in the public interest. To the same effect, with regard to motor carriers, see authorities cited in Lang Transportation Corp. v. United States, 75 F.Supp. 915, 927–928, 931 (S.D.Cal. Central Div. 1948), particularly I.C.C. v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945).[10] In unification or merger cases the Commission is expressly empowered to grant exemption from the Antitrust Laws. McLean Trucking Co. v. United States, 321 U.S. 67, 83–87, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Pittsburgh & L. E. R.R. Co. v. United States, 294 F.Supp. 86, 97 (W.D. Pa.1968). In determining the amount and character of competition which will be most beneficial to the public interest the Commission must "bring to bear upon the problem an expert judgment and . . . determine from its analysis of the total situation on which side of the controversy the public interest lies." United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945).

■ Moreover, it must be conceded, in all candor, that the Interstate Commerce Act, in its present form,[11] is itself inherently an anti-competitive instrumentality.

The legislative history of the Motor Carrier Act of 1935 (now part II of the Interstate Commerce Act as amended) shows that Congress feared "destructive" or "cut-throat" competition, and meant to impose on motor carriers many restrictions which in unregulated commerce would fall afoul of the Antitrust Laws. For example, the certification requirements of the Act (secs. 206 and 207, 49 U.S.C. §§ 306(a) and 307) certainly establish "barriers to entry" in the motor carrier industry. And barriers to entry are one of the significant criteria of restraint of trade in the Antitrust field. Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 578–579, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). Likewise, allocation of territory is a *per se* violation of the Antitrust Laws, akin to price-fixing. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136 (1899). But it is of the essence of the regulatory scheme, and expressly provided in Section 208

9. Dumbauld, Price-Fixing Conspiracies in Regulated Industries," 95 U. of Pa.L. Rev. 643, 646–649 (1947).

10. In the *Parker* case the Supreme Court points out that the dispute is (as in the case at bar) concerning which carrier shall be authorized to perform the service. 326 U.S. at 65, 65 S.Ct. 1490.

11. Incredible as it seems now, it is an historical fact that originally the Interstate Commerce Act of February 4, 1887, 24 Stat. 379 was "consumer protection" legislation, designed to combat the monopoly power of railroads. Section 5 of the original Act, unlike the present language permitting mergers and acquisitions in spite of the Antitrust Laws, forbade pooling of traffic by carriers. 24 Stat. 380. This prohibition may be regarded as the beginning of federal antitrust legislation and as a precursor of the Sherman Act of July 2, 1890, 26 Stat. 209. "The Sherman Act, with reference to the Commerce Act, is practically supplemental legislation. Its effect and operation is to broaden the provisions of Section 5 so as to embrace not only carriers, but manufacturers and producers as well." Snyder, The Interstate Commerce Act and Federal Antitrust Laws (1904) 122.

(49 U.S.C. § 308), that the territory or routes of a certificated carrier shall be specified in the certificate. In similar vein is the authority conferred upon the Commission by Section 204(b), 49 U.S.C. § 304(b), to establish classifications of carriers. This power has the intent and effect of confining carriers to a specific type of operations. Price-fixing itself is a consequence of the Commission's minimum-rate power and suspension power under Sections 216(e) and 216(g) of the Act, 49 U.S.C. §§ 316(e) and 316(g), which has often been used as an "umbrella" to protect high-cost carriers.[12] The unification provisions of Section 5, permitting acquisitions and mergers with exemption from the Antitrust Laws, have already been mentioned.[13]

Similarly, the Janus-faced language of the National Transportation Policy gives feeble support to the Department of Justice's position in the case at bar. As the Supreme Court has recognized, the "overlapping aims" of that declaration necessitate "the balancing by the Commission of the public interests" in the various conflicting legislative objectives.[14] Of the National Transportation Policy it may be said in the words of Goethe:

Wer vieles bringt, wird manchem etwas bringen; Und jeder geht zufrieden aus dem Haus.[15]

From the foregoing review of the statutory scheme, it seems clear that the adherent of Antitrust principles and economic policies favorable to competition will find only half a loaf in the pattern of regulation of the transportation industry embodied in the Interstate Commerce Act. We could not faithfully perform our judicial task of giving complete effect to the will of Congress if we interpreted the Act and the scope of the Commission's powers thereunder simply in the light of our own wish to encourage competitive enterprise.

A second aspect of the Commission's order in the case at bar likewise puts its critics' case in a favorable light. The order is not only anti-competitive, but it is anti-progressive. It tends to discourage the advancement of science and the widespread use of modern methods and up-to-date technology. It plays down the important factors of efficiency and convenience in transportation.

Here again, one whose personal convictions regarding public policy are largely derived from the teachings of Thomas Jefferson can not fail to find plaintiffs' position appealing when he remembers the familiar words of the sage of Monticello:

"And I am for encouraging the progress of science in all its branches; and not for . . . awing the human mind . . . to go backward instead of forward to look for improvement; to believe that government, religion, morality, and every other science were in the highest perfection in ages of the darkest ignorance, and that nothing can ever be devised more perfect than what was established by our forefathers."[16]

▮ Yet here, too, it must be remembered that the task of exercising expert judgment with regard to ques-

12. Because the Commission's minimum-rate power had been used as an "umbrella" to protect high-cost carriers, Congress in 1958 amended the "rule of rate-making" in Section 15a of the Act to curb this tendency of the Commission to keep rates up for the benefit of the high-cost carrier. See I. C. C. v. New York, N. H. & H. R. R. Co., 372 U.S. 744, 746, 756–759, 83 S.Ct. 1038, 10 L. Ed.2d 108 (1963); American Commercial Lines v. Louisville & N. R. R. Co., 392 U.S. 571, 580–590, 88 S.Ct. 2105, 20 L. Ed.2d 1289 (1968).

13. See McLean Trucking Co. v. United States, 321 U.S. 67, 83–87, 64 S.Ct. 370, 88 L.Ed. 544 (1944), *supra* [at p. 749].

14. I. C. C. v. Parker, 326 U.S. 60, 66, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945).

15. Goethe, Faust, ll. 97–98. ["Who brings much will bring something to many, and everyone goes out of the house satisfied"]

16. Thomas Jefferson to Elbridge Gerry, January 26, 1799. Quoted in Dumbauld, The Political Writings of Thomas Jefferson (1955) 47–48.

tions of transportation (including its growth and development) belongs to the Commission rather than the courts.[17]

Furthermore, closer analysis reveals that the Commission's order under review in the case at bar does not really have the reactionary consequences which at first blush it seems to radiate.

In actual fact, nothing in the Commission's order really limits or forbids the use of modern machinery or improved methods of packaging or handling commodities when they are being loaded onto trucks at a shipper's dock. The only restriction or prohibition imposed by the Commission's order is *with respect to whose trucks the goods shall be loaded into.*

The case at bar ultimately boils down to an economic conflict between two groups of carriers competing for certain available traffic.

This is precisely the classical case of an issue appropriate for determination by the Commission.

■ It is the traditional function of the Commission to determine which of two or more competing carriers should be awarded the authority to perform certain transportation service for the benefit of the shipping public.[18]

■ The fact that cranes, fork-lifts, or other modern handling devices regarded as "special equipment" may be used (if they belong to the shipper instead of the carrier) to load heavy articles *into vehicles operated by a general commodities hauler* [19] calls attention to another unattractive aspect of the order under review.

It appears unfair, at first blush, to permit a general commodities hauler to transport articles which *do* require special equipment for loading and unloading,[20] while not permitting a heavy hauler to make a counter-foray into the "turf" of the general commodities hauler.

■ However, upon reflection, it will be seen that the heavy hauler, as well as the general commodity hauler, does receive a *quid pro quo* under the "twilight zone" regime. The heavy hauler retains the right to transport traffic which *does* require special equipment, even if the equipment belongs to the shipper or consignee, and the heavy hauler in fact performs no special service and does nothing but furnish over-the-road transportation with ordinary conventional flat-bed equipment. The "twilight zone" arrangement is thus fair to both types of haulers. Each benefits equally from the shipper's activity, and receives an unearned windfall.

17. Future public convenience and necessity, as well as present public convenience and necessity, are matters appropriate for consideration by the Commission. Lang Transportation Corp. v. United States, 75 F.Supp. 915, 929 (S.D.Cal. Central Div.1948).

18. See, *e. g.*, I.C.C. v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945), referred to in note 10 *supra*. This function is a basic task of the administrative agency supervising any regulated industry. In Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 140, 145–146, 60 S.Ct. 437, 84 L.Ed. 656 (1940), the Supreme Court held that it was for the Commission to decide which of several rival radio stations should be preferred.

19. This rule applies if conventional vehicles suffice for the over-the-road haul,

and special equipment is needed only for loading or unloading. This so-called "twilight zone" was established in National Automobile Transporters Assn. v. Rowe Transfer, 64 M.C.C. 229, 240 (1955). See 108 M.C.C. at 723. *A fortiori*, a general commodities hauler may handle shipments which are heavy only because they are bundled into large packages if the loading and unloading is done by the shipper or consignee rather than the carrier.

20. There appears to be adequate rational justification for the *Rowe* ruling since all that the carrier there furnished was ordinary over-the-road movement in a conventional vehicle. The *carrier* used no special equipment. Certificate restrictions are addressed to the carrier, not the shipper. In any event, the situation in the case at bar is not the *Rowe* situation, but what has been called "aggregated" shipments. 108 M.C.C. at 724.

As set forth in Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91, 101, 105–106 (1966):

> Our interpretation of the phrase "requires the use of special equipment" is of vital concern to both classes, for while the heavy haulers are restricted *to* that type of service, the general-commodity carriers customarily are restricted *against* such service.
>
> \* \* \* \* \* \*
>
> We believe that the only practicable solution to this seeming dilemma in our regulation of the involved classes of carriers, though not as clear-cut an answer as we might wish, must inevitably be a continuation of the same overall approach which we have utilized in the past. That approach has been in the nature of an accommodation, a recognition of overlapping areas of service, as is probably best exemplified by the "twilight zone" theory set forth in the *Rowe* case. There it might well have been found that ordinary common carriers could not transport, in accordance with the literal terms of their certificates, commodities requiring special equipment for loading and unloading, even though those operations were performed by the shipper. In an accommodation to the general commodity carriers, however, such operations were found to be authorized, as long as the loading and unloading services were provided by the shippers and only ordinary flatbed trailers used. At the same time the decision to allow the heavy haulers to transport items which were in fact loaded and unloaded by the shippers and consignees could be considered an accommodation to the heavy haulers, since they provided no special equipment for such movements.

Having now dealt with those aspects of the case at bar which tug at the heartstrings of the Court, let us turn to an objective consideration of the Commission's order in order to ascertain exactly what the Commission did, and examine the criteria which it applied in reaching its determination.

■ The precise question before the Commission was whether the transportation by plaintiffs of certain types of traffic was permitted by the terms of the heavy hauler certificates which they held. The issue, in other words, involved interpretation of the certificates.[21] The rule therefore is pertinent that in the first instance (subject of course to the customary canons regulating judicial review and limiting the scope thereof) interpretation of certificates which it has issued is a matter for determination by the Commission itself in the exercise of its expert knowledge and informed judgment based upon longstanding familiarity with the transportation industry.[22] Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 177, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959); W. J. Dillner Transfer Co. I. C. C., 193 F.Supp. 823, 825–826 (W.D.Pa.1961).

■ In interpreting a certificate of public convenience and necessity (or any written instrument) we begin, as Justice Frankfurter reminds us, with the words of the document itself, although we may not end there. F. T. C. v. Bunte Bros., 312 U.S. 349, 350, 61 S.Ct. 580, 85 L.Ed. 881 (1941); Frankfurter, Of Law and Men (Philip Elman ed. 1956) 56.

The language of the certificates authorizes transportation of *"commodities which by reason of size or weight require* the use of special equipment." [Italics supplied] [23]

---

21. Since the Commission's action involved nothing but genuine interpretation of the certificates, there is no point to plaintiffs' contentions that the procedure for "revocation" of a certificate or for "rule-making" should have been followed.

22. The Commission's interpretation of its own work product should be at least as authoritative as the views of the early English judge who took part in the enactment of the statute of Westminster II. In 1305 Hengham, C. J. said to counsel: "Ne glosez point le statut; nous le savons meinz de vous, quar nous le feimes." Holdsworth, A History of English Law, II, 308 (1923).

23. 108 M.C.C. at 717.

The italicized words are the crucial points of the inquiry for purposes of interpretation.

It will be noted that the certificate speaks of "commodities" which require use of special equipment; not of "shipments" or "packages" which require use of such equipment.

█ The Commission very properly therefore held that primary regard must be had to the inherent and intrinsic properties and characteristics of the *commodities* themselves.[24]

If aggregation or bundling is necessary by reason of the "inherent nature" of the commodity itself to protect it from injury (as in the case of thin metal sheets, or articles subject to corrosion or chemical reaction if not properly packaged) the Commission clearly recognized that an aggregated package no heavier than reasonably necessary to afford the required protection might properly be handled by a heavy hauler.[25]

This principle was upheld by this Court's decision in the *Dillner* case.[26] To accept the contrary view, it was pointed out, "could well have extended the heavy haulers' certificates to cover the hauling of china cups or wooden nutmegs." [27]

Likewise the "inherent nature" rule was upheld by this Court in the *Aero* case. Judge Weber said:

> The wrapping of the palletized assemblies of ingots is done for their protection against caustic atmospheric conditions.
>
> \* \* \* \* \* \*
>
> The Commission's determination is entirely theoretical. It was not shown

by the evidence that these commodities are ever manually loaded or separately packaged. In the *Dillner* case (cit. supra) the Commission applied a formula which uses the "inherent nature" of the commodity as a standard to determine whether the rights of carriers under heavy hauler's certificate cover a commodity when assembled, packaged, or palletized. *Dillner* dealt with various types of steel and with fire brick. For motor carriers these were all palletized but the record in *Dillner* showed that these commodities had previously been actually shipped loose, both by motor carrier and by rail. It could, therefore, be reasonably and logically concluded that there was nothing in the "inherent nature" of the commodity that required it to be shipped by shippers with special handling equipment. *Dillner*, however, was a further refinement of a rule set forth in Black—Investigation of Operations, 64 M.C.C. 443 (1955), which *Dillner* states to be a limited exception to be maintained within its strictest limits. The Commission in *Black* distinquished [*sic*] between commodities aggregated because of their inherent nature, and those aggregated for the sake of efficiency and convenience. In *Black* the Commission was principally involved with large flat thin sheets of steel and aluminum, which were bundled or palletized by the shipper because of the handling difficulty which they presented by reason of their thin gauge and the likelihood of damage when handled individually. There the Commission found that the inherent nature of the commodity required it to be bundled for protection. *Dillner*,

---

24. 108 M.C.C. at 725, 737–738. Likewise the word "require" indicates that special equipment is *needed* to handle a shipment, not merely that in fact it was used. Of course, absolute impossibility to move the commodities without such equipment need not be proved in order to show that it was "required." See Marshall's exegesis of "necessary and proper" in McCulloch v. Maryland, 4 Wheat. 316, 413–414, 4 L.Ed. 579 (1819) ; and tax cases involving de-

ductibility of "ordinary and necessary expenses" under 26 U.S.C. § 162(a).

25. 108 M.C.C. at 736, 738.

26. 193 F.Supp. at 827.

27. *Ibid.* at 827. As the Commission says in the case at bar, acceptance of plaintiffs' position would result in "obliteration of any meaningful distinction" between commodities requiring special equipment and those not requiring such equipment.

in reaffirming the *Black* rule, required that it be kept within strict limits so that the carrier would have the burden of establishing a sound basis for coming within the rule. The District Court in affirming *Dillner* recited the evidence showing that the commodities in question, steel and fire brick, not only could be but were in fact hauled unpalletized and that convenience and saving labor and cost were the main consideration in palletizing the commodity.

\* \* \* \* \* \*

In the present case we fail to find the evidence upon which the Commission relied in refusing to apply the *Black* exception to the commodities in question here. The evidence to support the *Black* rule is substantial; the inherent nature of the commodities which required aggregation and palletization here were the varying chemical compositions and alloys of the aluminum ingots involved, which required separation; the soft, fragile and easily abraded quality of individual ingots which required palletizing; the wrapping of the palletized packages to protect them from the corrosive atmosphere in the neighborhood of the shipper's plant; the refusal of customers to accept aluminum ingots and billets loose; and the inconvenience and expense of crating or packaging each individual ingot and billet separately in a form not acceptable to the customer.[28]

The Commission was therefore correct as a matter of law in applying the intrinsic properties rule in the case at bar.

Moreover, the Commission also gave weight to the factor of historic industry practice.[29] The Commission emphasized that "a conclusion favorable to the heavy hauler premised on present day shipping practice would obviously be unwarranted when the commodity involved is aggregated almost entirely on the basis of economy and efficiency and has *a prior history of satisfactory handling by manual labor.*"[30] [Italics supplied]

In evaluating "historic shipping practices" the Commission regarded "significant prior use of manual handling" as a circumstance "tending to show that the current resort to mechanized procedures is attributable primarily to factors bearing on economy and efficiency rather than on the item's basic characteristics."[31]

The Commission also accorded weight to the historic categories of carriers and the traditional types of traffic handled in the past by each group of carrier.[32]

Unlike the railroads, which handled passengers and all types of freight indiscriminately, the motor carrier industry has, from the outset of regulation, been characterized by specialization of labor and division into particular classes of carriers each having a separate sphere of service. The governing statute itself expressly authorized the Commission to establish such classifications. 49 U.S.C. § 304(b). Very early in the course of its regulation of motor carriers the Commission prescribed such classifications.[33]

Heavy haulers were from the outset one of the seventeen special categories established by the Commission.[34]

28. Pages 6, 7–8, 9. We quote extensively from this opinion, as it was not published. See note 3 *supra*.

29. Guidelines (2), (3), and (4) at 108 M.C.C. 737.

30. 108 M.C.C. at 739. In *Dillner* the court referred to testimony showing "that firebrick was exclusively handled by the railroads prior to 1950; that they could be hauled unpalletized and, in fact some are

so hauled." 193 F.Supp. at 827. See note 3, *supra*.

31. 108 M.C.C. at 741.

32. 108 M.C.C. at 742.

33. Ex Parte No. MC–10, Classification of Motor Carriers of Property, 2 M.C.C. 703, decided August 9, 1937.

34. 2 M.C.C. at 706–708. The class was at first designated as "Carriers of heavy machinery."

Common carriers of general commodities, with the usual exceptions,[35] constituted another separate class of carriers which has been recognized since the early days of motor carrier regulation as a specific sphere of service.

This division of the separate types of traffic handled by motor carriers into particular traditional spheres or fields of service may well be denominated as "protectionism" or "Balkanization" of the industry, as the Department of Justice has done in argument. But it is a well-established feature of the regulatory scheme as intended by Congress. It can not be annihilated by Departmental or judicial fiat for antitrust reasons because it tends to allocate traffic to particular carriers or eliminate competition between them.

The Commission was therefore well warranted in according weight to the historical factor in interpreting the certificates involved in the case at bar.

It is conceivable that investigation might disclose the existence of a well-nigh universal practice of mechanical loading utilizing equipment belonging to the shipper.[36] In such event, it could perhaps be concluded that there is no practical difference between the services performed by the heavy haulers and the general commodities haulers, and that there is no purpose to be served by continuing to preserve and enforce the distinction between the two types of carriers. In that case the Commission could reclassify the carriers, and perhaps permit present heavy haulers to convert their operations into general commodities operations. It is likely, however, that new legislation would be needed to authorize such a general conversion, as in the case of contract carriers. See United States v. Contract Steel Carriers, 350 U.S. 409, 411–412, 76 S.Ct. 461, 100 L.Ed. 482 (1956); Act of August 22, 1957, 71 Stat. 411 [49 U.S.C. § 312(c)]; I.C.C. v. J–T Transport Co., 368 U.S. 81, 85–87, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).

 It may also be noted that there is no prohibition against a single carrier's holding both heavy hauling and general commodities authority (such as the prohibition in 49 U.S.C. § 310 against dual operation as a common and contract carrier). Hence upon the usual proof of public convenience and necessity a heavy hauler is free to expand his operations into the sphere of general commodities. The restriction on competition attributable to the Commission's order is thus no

---

This group includes carriers, both common and contract, engaged in the hauling of heavy machinery and equipment, including road machinery, structural steel, oil-field rigs, and oil-field equipment. These commodities are grouped together because of the equipment required and the nature of the service performed . . . Certain auxiliary or accessorial services are also performed in the transportation of these commodities, such as the dismantling and resetting of machinery, often requiring the use of rigging, skidding, and similar devices. [2 M.C.C. at 710] Later the description was phrased in terms of the type of service performed, requiring special equipment either for loading, unloading, or over-the-road movement. Osborne Common Carrier Application—Heavy Materials, 47 M.C.C. 633, 640 (1948); Gallagher Common Carrier Application, 48 M.C.C. 413, 415 (1948); Descriptions in Motor Carrier Certificates, 61 M.C.C. 209, 268–70 (1952).

35. Heavy haulage was one of the "usual exceptions" specified in the certificates of carriers of general commodities. The other usual exceptions are commodities of unusual value, explosives, household goods, commodities in bulk, or those injurious or contaminating to other lading. See Ex. 10 and 17, and 61 M.C.C. at 216.

36. It should be emphasized that the testimony in the present record shows that most industries have loading docks (Tr. 439, 447); that some of the particular shippers here involved who use power equipment do not have docks (Tr. 43, 51, 289) and that they use such equipment for reasons of economy and efficiency, rather than because it is needed by the nature of the commodity (Tr. 30, 32, 88, 279); and that they use the same equipment to load vehicles of general commodities carriers which they use to load those of heavy haulers (Tr. 50, 59–60, 293).

greater than what is required and contemplated by the regulatory scheme prescribed by Congress.

And we repeat again that the order under attack does not really deprive the public of the use of modernized equipment. It merely prevents utilization of such equipment as a means of expanding the permissible business of one class of carriers, at the expense of another type of carriers. We are dealing simply with a competitive struggle between carriers for available traffic; and, as we have seen, the question as to how much competition in the motor carrier industry should be permitted as in the public interest is a matter which Congress entrusted to the Commission to determine.

In short, the Commission in the order under attack has made an earnest, conscientious, painstaking and legitimate effort to maintain an appropriate boundary between the spheres of activity of the two types of carriers, confining each to its appropriate and traditional sphere in accordance with the terms of its certificated authority. The Commission's order is rational and articulate. We have no occasion to complain, with Mr. Justice Cardozo, that: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." United States v. Chicago, M., St. P. & P. R. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935). Nor can we here invoke Chief Justice Stone's quip: "As we were in doubt as to the intended scope of the Commission's order, . . . we requested a brief on its behalf discussing the meaning and application of its order

. . . Although the brief is not wholly free from the obscurity surrounding the order itself, the Commission's ultimate position . . . is one which, under all the circumstances of the case, we accept." Illinois Commerce Commission v. Thomson, 318 U.S. 675, 681, 63 S.Ct. 834, 837, 87 L.Ed. 1075 (1943). Both the Commission's order and its brief and oral argument are characterized by unusual lucidity and cogency. The issues to be resolved have been thoroughly and meticulously discussed.

We thus conclude that the criteria applied by the Commission in interpreting plaintiffs' certificates were not vitiated by mistake of law or misapplication of legal standards. Nor are these criteria arbitrary,[37] capricious, *ultra vires*, unconstitutional, or otherwise invalid for any reason.

It remains then only to inquire whether the specific conclusions reached as to particular items of traffic are supported by substantial evidence in the record. In that connection, it should be stated that, in accordance with the governing statute (28 U.S.C. § 2323) we have granted all petitions for intervention presented by parties in interest to the proceeding before the Commission. Some of these parties have submitted affidavits, ruling on the admissibility of which was deferred at the argument. Counsel then stated that they were offered merely to establish the interest and sustain the status of the parties as intervenors. For that purpose we receive them. United Transports, Inc. v. United States, 214 F.Supp. 34, 38 (W.D.Okl. 1962). On the merits of the case, we

---

37. Plaintiffs argue that the criteria enunciated by the Commission are arbitrary because two prior decisions, found inconsistent with the general trend and constellation of Commission decisions, were overruled. 108 M.C.C. at 743. To this contention, regardless of the merits of the two cases involved, there are three convincing answers: (1) The Commission's decisions are not required to be consistent: indeed, one of the supposed advantages of the administrative process is its flexibility and capability of adaptation to fluctuating fact-situations [see Va. Stage Lines v. United States, 48 F.Supp. 79, 83 (W.D. Va.1942); (2) Courts in applying *stare decisis* do not blindly follow the latest decision if it conflicts with an established doctrinal trend [see Livingston's Executrix v. Story, 11 Pet. 351, 400, 9 L.Ed. 351 (1837); Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940)]; (3) "How can what an Englishman thinks be heresy?" How can what the Supreme Court does, with increasing frequency, be arbitrary?

confine our consideration to the evidence in the record before the Commission rather than utilizing subsequent affidavits. Mississippi Valley Barge Line v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). Additional evidence *de novo* is ordinarily received only on constitutional questions of confiscation; and there is some doubt whether even in such cases new evidence need be received, or whether a fresh and independent judicial examination of the record already made suffices. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51–54, 56 S.Ct. 720, 80 L. Ed. 1033 (1936); R. R. Commission of Texas v. Rowan & Nichols Oil Co., 311 U.S. 570, 575–576, 61 S.Ct. 343, 85 L. Ed. 358 (1941).

There are eleven items with respect to which the Commission made findings adverse to plaintiffs. Having examined the entire record [38] before the Commission, we shall discuss *seriatim* the testimony dealing with these items.

1. *Earth-moving tractors* (shipment #3, discussed at 108 M.C.C. 745–46). This appears to be the most questionable determination made by the Commission in the case at bar. The four tractors shipped to separate destinations weighed 7859, 8013, 8024, and 10010 pounds respectively (Tr. 12). The witness Migala admitted that they could have been loaded under their own power from an elevated loading platform or by use of a ramp (Tr. 14, 28, 39).[39] Though the shipper has a loading dock, it is distant from the place where the trailers are stored prior to shipment. For economic reasons or efficiency, it is simpler to drive them 100 feet to where the overhead crane loads them (Tr. 30). Where a closed top trailer is used, the tractors

are loaded under their own power, 500 feet from the location of the crane (Tr. 36, 39). In the past, the tractors were loaded under their own power by a ramp also used for loading railroad cars; but the shipper's safety department frowned on this procedure, and it was abandoned (Tr. 37–38).

With regard to similar road-building equipment, the Commission said in Dallas & Mavis Forwarding Co., Inc., Extension—Galion, Ohio, 72 MC.C. 653, 656–57 (1957):

Since no special equipment or handling is required either for loading, unloading, or over-the-road transportation, these particular units lawfully may not be transported by heavy haulers whose authority is confined to the movement of commodities requiring the use of special equipment or handling. The situation is different on shipments of the larger rollers to job sites, for, despite the allegations of the iron works to the contrary, we are not convinced that they can be safely unloaded from flat-bed trailers standing as high as 4 feet from the ground without the use of special equipment. In addition, the weight of these units and of the larger graders, is not equally distributed but rather is concentrated upon the small and narrow areas where the rollers of wheels make contact with the bed of the vehicle. The transportation of the larger units, those weighing approximately 15,000 pounds or more, obviously necessitates the use of braced or heavily reinforced flatbed trailers especially designed for hauling exceptionally heavy commodities and which, when used for that purpose, would belong in the category of "special equipment" as that term has

38. There is a hiatus between pages 527 and 613 of the Transcript (hereinafter cited as "Tr."). Counsel have explained that by agreement the omitted material, dealing with a consolidated separate issue relating to safety regulations, has no bearing on the issues pertinent here with respect to interpretation and application of the heavy haulers certificates held by plaintiffs.

39. In fact he said "they were driven onto the trailer under their own power." This contradicts his later statements that they were loaded using a crane (Tr. 18, 29). He may have meant that they were driven under their own power from the storage area to the crane (Tr. 30).

**758**

been defined by the Commission. See St. Johnsbury Trucking Co., Inc., Extension—Heavy Hauling, 53 M.C.C. 277, 298. Nevertheless, it is clear that these protestants may not, under the authority just discussed, participate in that segment of traffic which does not require special equipment or handling, either for over-the-road movement or loading and unloading.

Although the Commission in the above-quoted passage says that specially reinforced equipment is "obviously" necessary for carriage of self-propelled vehicles weighing over 15,000 pounds, it is nevertheless common knowledge that flat bed trailers regularly transport loads heavier than that. The Commission's so-called "last resort" rule in *Dallas* is intrinsically meretricious. If it were sound, it would be hard to support a distinction between 8,000 and 15,000 pound vehicles; both being "obviously" too heavy for manual lifting or propulsion, and both being equally capable of moving under their own power.

But to speculate regarding deficiencies of the *Dallas* doctrine is to flog a dead horse; the question is moot, since the *Dallas* decision was set aside by a three-judge court in United Transports Inc. v. United States, 214 F.Supp. 34, 37, 39, 44 (W.D.Okl.1962). The court's logic is impeccable. These vehicles are not covered by the carrier's heavy hauler certificate for the reason that in truth and in fact no special equipment was used or required for the movement. The tractors were driven part of the way under their own power over the highways, then up a ramp onto a flatbed trailer for the rest of the journey and then unloaded under their own power at destination. Since no special equipment was in fact used, "obviously" (to employ the Commission's adverb) none was "required."

The *United Transports* decision triggered a massive grant of operating authority to permit transportation of such

vehicles weighing over 15,000 pounds in a mammoth proceeding involving sixty heavy haulers who sought extensions of their certificated authority upon proof of public convenience and necessity. Ashworth Transfer, Inc.—Extension—15,000 lb. Articles, 103 M.C.C. 404, 410 (1966). This large-scale proceeding demonstrates the feasibility of dealing with the competitive problems of heavy haulers under the customary procedures when a genuine need exists.

Nevertheless, in the fitness of things there is some justification for what the Commission sought to accomplish by means of the *Dallas* ruling. One feels instinctively that a vehicle of this type (whether weighing 7000 or 15,000 pounds) ought to be treated as a piece of heavy machinery properly falling within the category of commodities constituting the historical and traditional field of service belonging to the heavy haulers.

This feeling is reinforced by the conviction that such freight, unlike passengers or cattle, is normally tendered to carriers in its natural, inert state; and that a shipper ought to be entitled to tender for transportation a new automobile,[40] for example, without supplying it with gasoline and a chauffeur.

But notwithstanding these misgivings regarding the propriety of the Commission's treatment of heavy machinery possessing the potentiality of autonomous locomotion, we are constrained to sustain the Commission's ruling with respect to the particular shipments involved in the case at bar; for, as has been seen, the testimony in the record shows that these four tractors were in fact tendered for shipment supplied with diesel fuel and were in fact driven under their own power from the storage area to the crane; and at the same plant on other occasions similar vehicles were in fact loaded under their own power in closed-top trailers and by use of the ramp at the rail siding. The rationale of *United Transports* is determinative here.

40. Of course automobiles are ordinarily carried in double-decker caravan type trailers, which constitute special equipment; but this is not necessarily so.

But we regard the Commission's decision in the case at bar as devoid of value as a precedent under different circumstances; and feel impelled to state our opinion that if such vehicles of 7000 to 10,000 pounds were tendered without fuel at a point in close proximity to the end of a production line in a new plant (with no ramp or loading dock) where no past history of self-propelled loading could be shown, a heavy hauler should feel free to transport such traffic unless and until the Commission, in a subsequent proceeding, upon an adequate record, dealing convincingly with the matters mentioned above, shall have determined otherwise.

2. *Pallets and skids* (shipments #8 and 9; 108 M.C.C. 746). The testimony shows that a single pallet weighs 167 pounds, and could be loaded manually (Tr. 262). The lift truck used for loading would have to be used to move the articles 400 to 500 feet from the storage area to the loading dock, and it would be possible but impractical to then load the pallets individually by hand (Tr. 263–64). The skids weighed 121 pounds each, and could be loaded manually (Tr. 264–65). Banding the individual items together enables the full capacity of the vehicle to be utilized, up to the height limit (Tr. 273, 276); and enables the minimum requirements of a truckload rate to be met (Tr. 279). This is an economic reason, rather than an intrinsic aspect of the commodity. So too, the oily substance found on the pallets results from production techniques, and is not designed to protect the pallets in transit (Tr. 278).

The Commission's conclusion with respect to this commodity is thus clearly correct, under the applicable legal criteria.

3. *Apparatus cabinets* (shipments #10 and 11; 108 M.C.C. 746–47). The testimony shows that these articles weigh almost 100 pounds, and could be loaded manually (Tr. 42–43). This shipper has

no ramp or loading dock (Tr. 43, 51). The articles are loaded in the same manner when hauled by general commodities carriers (Tr. 49–50). The evidence here supports the Commission's conclusion.

4. *Rails* (shipments #15 and 16; 108 M.C.C. 747–48). An individual rail, for some reason called a 30 pound rail, weighs 150 pounds (Tr. 56); and could be manually loaded (Tr. 60). Aggregation or bundling is not necessary for protection of the product from damage (Tr. 65). The shipper has used general commodities haulers in van type equipment (Tr. 59), where the same method of loading is used (Tr. 60). For two men to carry the rails from the storage area to the loading area they would have to "snake their way" around and over other material for a considerable distance (Tr. 63, 67). This evidence supports the Commission's conclusion.

5. *Threaded steel pipe, less than 200 lbs.* (shipments #27, 66–72; 108 M.C.C. 748–49). The Commission permitted the heavy haulers to handle pipe weighing approximately 200 pounds and over. This seems like a reasonable limit to manual handling. The evidence shows that manual loading of the lower weights is possible, but is not practiced for economic reasons (Tr. 205–206, 213, 220, 223–24). For trade reasons, to protect jobbers, pipe is shipped only with a 40,-000 pound minimum (Tr. 207). The shipper uses general commodity haulers for the same product (Tr. 207). Bundling is not needed to protect the product from damage (Tr. 218); but the load is safer during transit when bundled (Tr. 211, 519–22).[41] Here again the evidence supports the Commission's conclusions.

6. *Conduit pipe* (shipment #28; 108 M.C.C. 749–50). These items could be loaded manually (Tr. 283), and weigh 100 to 150 pounds (Tr. 284). They are loaded individually by crane (Tr. 285); the shipper has no dock (Tr. 289). The same method of loading is used when

41. We emphasize again, that bundled pipe can be loaded on vehicles belonging to general commodities carriers. The public safety is not endangered by the Commission's order. The struggle is between two groups of carriers for traffic.

shipments move by general commodities haulers (Tr. 292–93). This evidence supports the Commission's conclusion.

7. *Wrought steel pipe* (shipment #29; 108 M.C.C. 750–51). This pipe, according to the shipper's testimony, weighed 100 to 150 lbs. per piece (Tr. 284). The shipper has no dock (Tr. 289–90). The pipe could be lifted by two men under appropriate circumstances (Tr. 292). In view of testimony that plants generally have loading docks, the Commission was warranted in finding that the use of a crane by this particular shipper does not suffice to qualify this commodity as one requiring special equipment.

8. *Metal lath* (shipment #44; 108 M.C.C. 753–54). Here the Commission's denial of heavy hauler authority rests on the fact that a consignee unloaded the material by hand by breaking bulk (Tr. 69, 75). The product for protection requires bundles of at least 10 sheets (Tr. 76). The weight of such a bundle was not clearly stated, but may be inferred from consignee's testimony to be five pounds (Tr. 76).[42]

In the report of Division 1, dated September 28, 1967, 105 M.C.C. 801 (Appendix C to Complaint herein) at p. 809, it is stated that: "During production bundles of 10 pieces of lath are wired together in order to protect the items from bending. These smaller bundles are considered too flimsy for safe handling and loading, and, in turn, are rebundled and palletized in packages consisting of about 50 of the small, 10-piece bundles before tendered for transportation. Protective devices and throwaway sheets are placed

around the outer surface of the pallet to prevent damage to the entire package in banding, loading, and unloading."

No shipper witness from Inland Steel Co. was called, and nothing can be found in the testimony of the consignee to support the conclusionary statement of Division 1 that a 10-piece bundle is "too flimsy" and that the product by reason of its intrinsic characteristics requires further bundling.[43]

The only evidence was that of the consignee, regarding unloading. The consignee, a plasterer, may resort to such primitive methods of breaking bulk as he chooses in order to get this material off the truck. That does not prove whether special equipment was required for *loading* the product in order to protect it adequately until arrival at destination. There is no convincing evidence as to what size or weight of package would properly be required by reason of the intrinsic qualities of the commodity.

The Examiner's Report, served February 20, 1967, App. B to Complaint herein, at sheet 40, says that the commodities are "not contemplated for transportation by a heavy hauler" and that roofing and siding have in fact been loaded manually in the past.

Possibly as a matter of Commission expertise or general knowledge one might accept the conclusion that one would ordinarily expect a light and flimsy article like lath to be transported by general commodities haulers rather than by heavy haulers.

Hence, we are perhaps making too much ado about one shipment, since the evidence does not permit us to say either

---

42. Ex. 1 states that 50 bundles are palletized, pallet weight 3500 pounds. Disregarding tare weight of the pallet, the bundle of 10 pieces would weigh 70 pounds. Ex. 1 also states that one sheet weighs 7 pounds, and a bundle of 10 sheets 70 pounds. Ex. 1 is a list of shipments compiled for the Bureau of Inquiry before the hearing and subject to verification by witnesses. Tr. 9.

43. The statement is evidently based on "canned" testimony submitted by Mr. Dor-

an, president of plaintiff (Ex. 39, pp. 18–19). The Examiner, somewhat capriciously, ruled that the sentence on p. 18 that individual pieces had to be bundled should be stricken as self-serving, but that the motion to strike should be denied with respect to the sentence on p. 19 that individual bundles had to be further bundled and palletized (Tr. 658). But even Mr. Doran does not say what a minimum protective bundle would weigh. He merely describes what was in fact done.

that the Commission is wrong or that the Commission is right. Under the circumstances, in view of what has been said, the issue is best disposed of by upholding the Commission's conclusion, on the basis of antecedent probability, but emphasizing that its ruling here is not to be accorded any value as a precedent, and that if the same issue should arise in connection with any subsequent proceedings it must be resolved upon the basis of an adequate record.

9. *Steel roofing sheets* (shipment #45; 108 M.C.C. 754). The largest length was 12 feet (Tr. 345), weighing 78 pounds (Tr. 346). The sheets could have been loaded manually, but it would not have been economical (Tr. 346). The shipper loaded from a dock (Tr. 347). The material is asbestos-coated, and requires a throwaway sheet at the top and bottom of the bundling for protection of the coating (Tr. 348–50). In the past manual loading was in fact practiced, and then the waster sheets were not used (Tr. 350–51). The change to bundling was made for purely economic reasons (Tr. 355).

The weight of this somewhat confused testimony was for the Commission, and its conclusion as to this item of traffic seems adequately supported by record evidence.

10. *Channel iron and steel under 200 pounds* (shipment #47; 108 M.C.C. 755–56). The evidence regarding this shipment is obscure (Tr. 83–86). The Commission authorized pieces weighing 240 pounds. Another bundle of eleven pieces weighed 1260 pounds, or slightly over 114 pounds on the average. These the Commission regarded as too light for heavy hauler authority. Two other bundles of 14 pieces weighing in all 2085 pounds were apparently disregarded in the Commission's ruling. On the whole, it is

impossible to say that the Commission has deviated from its 200 pound rule of thumb, which we have previously judged to be a reasonable line between light and heavy items.[44]

11. *Corrugated culvert pipe under 200 pounds* (shipments #49, 50, 51; 108 M.C.C. 756–57). Here, too, the Commission authorized heavy hauler handling of items weighing 240 pounds, but excluded the items under 200 pounds. The testimony shows different sizes and weights. A ten foot 16 guage specimen would weigh 124 pounds (Tr. 86). For reasons of economy the pipe is stacked ten feet high to make a full truckload. This required mechanical loading (Tr. 87–88). On the whole it would seem that the Commission here exercised appropriate discrimination in evaluating the evidence.

Recapitulating, I conclude that with respect to all eleven of the items ruled upon adversely to plaintiffs by the Commission, there is sufficient evidence in the record to support the results reached by the Commission.

From the foregoing it follows that the order of the Commission here under attack must be sustained, and the relief prayed for in the complaint be denied.

ALDISERT, Circuit Judge (concurring).

In Ace Doran Hauling & Rigging Co., Investigation of Operations, 108 M.C.C. 717 (1969), the Interstate Commerce Commission issued an order interpreting as outside the scope of a heavy hauler's certificate the transportation of commodities the "inherent nature" of which does not "require" that they be bundled or aggregated for loading. In so doing, the Commission again relied upon the "inherent nature" test as the standard for determining whether a commodity re-

44. In exceptional cases, such as heavy cylindrical bombs (of 500 to 750 pounds) which can be rolled easily, a higher weight limit is appropriate. The Commission's decision in the bomb case was upheld by a three-judge court in Missouri in International Transport, Inc. v. United States,

337 F.Supp. 985, W.D.Mo., Southwestern Division, decided January 21, 1972. Assuming the correctness of that decision as a precedent, the Commission's decision in the case at bar should be sustained *a fortiori.*

quires aggregation or loading on a unit basis.

Thus, the "reasoned" rule for dividing the traffic between the general carriers and the heavy haulers now promulgated by the Commission is this:

1. General haulers may haul any commodity, except certain specialized commodities not pertinent here, including those which are tendered by shippers in aggregated packages or bundles which require the use of special equipment so long as the carrier itself does not own the special equipment.

2. Heavy haulers may transport only those commodities which, by reason of their inherent or intrinsic characteristics, require special equipment whether the equipment is owned by the carrier or shipper.

Because I view the "inherent nature" standard as outmoded and unrealistic, and stripped by technological advancement of whatever validity it may have once possessed, I am put to strain by the majority's endorsement of its vitality.

This court offered an explanation of the workings of this test in W. J. Dillner Transfer Co. v. I.C.C., 193 F.Supp. 823, 827 (W.D.Pa.), aff'd., 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1961):

[T]he test is what is the inherent nature of the commodity itself. If the commodity required aggregation not for the mere purpose of economy and efficiency, but because of the inherent nature of the commodity, and after bundling they would become too heavy to handle without the use of special equipment, special bundled commodities would be within the purview of an article requiring special equipment; otherwise it would not.

Thus, if a commodity can be loaded on a unit basis, it must be carried by a general hauler. Now, after witnessing one modification of this approach (Aero Trucking, Inc. v. United States, 1966 F.C.C. ¶ 53,036 (W.D.Pa.1966)), and fashioning a second (Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91 (1966)), the Commission, in Ace Doran, has reasserted its previous statement of the "inherent nature" test, as contained in Dillner.

In an era where the mechanized loading of aggregated commodities has become virtually a universal practice, the obvious purpose behind the formulation of the "inherent nature" test is to create protection for general haulers lest they suffer invasion at the hands of the heavy haulers. To insulate the general haulers, the Commission, in Ace Doran, sought to "preserve the historically recognized limits of heavy hauler service," thereby seeking to prevent heavy hauler encroachment upon general hauler business.

In my view, the Commission has utterly failed to perceive that the hauling industry has undergone drastic technological change, rendering the limits envisioned by the Commission an anomaly. Indeed, history itself, as reflected in the realities of the hauling industry, has bypassed the Commission. The majority properly observe:

It is conceivable that investigation might disclose the existence of a well-nigh universal practice of mechanical loading utilizing equipment belonging to the shipper. In such event, it could perhaps be concluded that there is no practical difference between the services performed by the heavy haulers and the general commodities haulers, and that there is no purpose to be served by continuing to preserve and enforce the distinction between the two types of carriers. In that case the Commission could reclassify the carriers, and perhaps permit present heavy haulers to convert their operations into general commodities operations. . . .

It may also be noted that there is no prohibition against a single carrier's holding both heavy hauling and general commodities authority (such as the prohibition in 49 U.S.C. § 310 against dual operation as a common and contract carrier).

Slip Opinion, at 755.

In the face of this, the preservation of "historically recognized limits" represents blind administrative endorsement of obsolescent industry practices. By ruling that bundled, aggregated, or palletized commodities are presumed to be outside the scope of heavy hauler authority, the Commission, simply stated, has all but lost sight of the realities of economical and efficient hauling requisite in an accelerating industrialized society. Indeed, a determination that industry practice, economy, and efficiency are not relevant to the inquiry whether a commodity must be shipped in bundles or individually, reflects a total lack of appreciation for the state of hauling today. As urged by the United States, which found it necessary to assume a position opposite to the I.C.C. in this case, this protectionism policy for general carriers freezes the industry in an outmoded technology. By severely restraining competition, the Commission convincingly eschews the promotion of an efficient hauling system operating on a sound economic basis.

In its brief urging that this court enjoin the enforcement of the Commission's order, the United States has delineated with specificity the scope of judicial review it believes applicable to the instant proceeding:

The Administrative Procedure Act, 5 U.S.C. 706, requires a court, on judicial review of agency action, to "decide all relevant questions of law . . . and determine the meaning or applicability of the terms of an agency action." It must set aside agency action which fails to meet the six criteria set forth in Section 706.[1] This scope of review to assure that agencies faithfully carry out the responsibility for deciding issues of public policy entrusted them by Congress. While reviewing courts cannot overrule an agency's decision "merely because they disagree with its wisdom" (Radio Corporation v. United States, 341

is intended to assure that agencies faithfully carry out the responsibility for deciding issues of public policy entrusted them by Congress. While reviewing courts cannot overrule an agency's decision "merely because they disagree with its wisdom" (Radio Corporation v. United States, 341 U.S. 412, 420, 71 S.Ct. 806, 810, 95 L.Ed. 760 (1951)), they must subject its action to "thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136. This is necessary because it is the administrative agency, not the court, which is charged with exercise of the expertise necessary to regulate an industry. Thus when an agency has properly explained and supported its action in accordance with law,

"its judgment is entitled to great deference because of its familiarity with the conditions in the industry which it regulates." East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574, 577, 100 L.Ed. 917 (1956). See also United States v. Pierce Auto

---

1. The relevant portions of § 706 are:
"The reviewing courts shall—
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to a trial de novo by the reviewing court."

Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

Nevertheless, reviewing courts cannot simply "stand aside and rubber-stamp their affirmance of administrative decisions." NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). Courts and agencies are " 'collaborative instrumentalities of justice,' " Greater Boston Television Corp. v. Federal Communications Commission, 143 U.S.App.D.C. 383, 444 F.2d 841, 851–852 (1971); the courts cannot slight their responsibility to properly supervise agency action. Agency action cannot be upheld merely "with a nod in the direction of the 'substantial evidence' test, and a bow to the mysteries of administrative expertise." Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 597 (1971) (footnotes omitted). For if the exercise of administrative "expertise" were left thus unexamined, it would then " 'become a monster which rules with no practical limits on its discretion.' " Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

The cornerstone of judicial review of agency action is court insistence on "reasoned decision making." Columbia Broadcasting System, Inc. v. Federal Communications Commission, 454 F.2d 1018, 1025 (D.C. Cir. 1971). As the Supreme Court has recently noted, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v.

Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971). Courts must be satisfied that the agency "has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." Greater Boston Television Corp., *supra*, 444 F.2d at 850. By this insistence courts do not substitute their concepts of public policy for those of the agency. Rather, courts simply insure that the agency has adequately carried out its duty to determine the public interest, and has fully "focus[ed] on the values served by its decision." Greater Boston Television Corp., *supra*, 444 F.2d at 852.[2]

In its brief, the United States has urged:

In this case, however, the Commission's opinion gives this Court no assurance that it has indeed focused on the "values served by its decision." It is not an example of the requisite "reasoned decision making." The Commission has decided to protect from competition one class of carriers, without bothering to explore the impact of this policy on shippers, other carriers, or the consumer public. It has not explained to this Court how the policy of protectionism—unsupported by considerations of varying transportation services or shipper needs—can possibly comport with the mandate of the National Transportation Policy to promote an efficient and economical transportation system. Nor has it even arrived at a reasoned rule for dividing the traffic between the different types of carriers.

One example is illustrative of the arbitrariness of the guidelines articulated in *Ace Doran*. The Commission has

---

**2.** These considerations apply whether the proceedings involve rule making or adjudication. In both instances the whole record must be canvassed in a searching and careful inquiry to determine whether the agency has reached a reasoned conclusion, based on a factual predicate supported by the record, within the applicable statutory authority. See City of Chicago, Illinois et al. v. Federal Power Commission et al., D.C. Cir., 458 F.2d 731, decided December 2, 1971.

determined that merely because it is theoretically possible to load individually a series of 30 foot rails, each weighing 150 pounds, these rails are outside the scope of a heavy hauler's authority because they do not require bundling. The realities of the hauling industry apparently escape the Commission. That it is possible to load articles such as these rails individually does not produce the conclusion that general haulers will employ this method of loading these rails, one at a time. Indeed, for reasons of safety, economy, and efficiency, shippers will continue to require that general haulers load such articles in heavy aggregates.

Clearly, in this case, the Commission should adhere to its own suggestion that "it would seem unreasonable to deny a heavy hauler the authority to transport commodities because it is *physically possible* to handle them without special equipment, leaving the field of service open to general commodity carriers which will never handle the commodities any other way than *with* special equipment." Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91, 107 (1966).

This having been said, however, in the final analysis, I must be guided by the Supreme Court's most recent interpretation of the standard of court review of I.C.C. orders. In United States v. Allegheny Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (June 7, 1972), the Court stated, in reversing the judgment of a three-judge court which held invalid a Commission order enforcing two "car service rules":

> The standard of judicial review for actions of the Interstate Commerce Commission . . . is well established by prior decisions of this Court. We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations which the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported.

92 S.Ct. at 1946.

It remains only for me to observe that although I agree completely with the position taken by the government in this action, that position is totally irreconcilable with that apparently taken by the government before the Supreme Court in *Allegheny Ludlum*.[3] Nor will I attempt to distinguish this action from *Allegheny*

3. The inconsistency of the government's position in the case at bar with that taken in *Allegheny Ludlum* is dramatically illustrated by its argument urged upon, and readily accepted by, the Supreme Court, that the economic effect upon carriers and shippers of I.C.C. rules is a factor of relative insignificance. As I have heretofore observed, the Commission's rules here have all but lost sight of the reality of economical and efficient hauling in today's industrialized society. Moreover, in this case the government apparently agrees. Yet, in the railroad case, at the apparent urging of the government, the Court suggested: "If, as a result of [an inadequate supply of freight cars] such roads are placed under economic and competitive pressure to acquire additional freight cars, there is certainly no principle of law we know of which would require the Commission to permit them to avoid this economic pressure by continuing to borrow freight cars acquired and owned by other lines." 92 S.Ct. at 1949.

The inconsistency in the government's position in *Allegheny Ludlum* fairly leaps from this statement. The reference to the "principle of law," refers not to law in its jurisprudential, but in its economic, sense. In the geographic confines represented by this judicial circuit, 7,209 miles out of the total trackage of 10,422 miles, or 69.2%, is now in bankruptcy—the Penn Central, Central of New Jersey, Lehigh Valley, Reading Railroad, and Lehigh and Hudson River Railroad. *See*, 1972 Rail Facts, Economic and Financial Division of Association of American Railroads. To suggest that these roads possess financial resources to purchase additional freight cars flaunts the realities evidenced by a score of district court and appellate cases morosely demonstrating the acute financial distress of the railroad industry. To suggest, alternatively, that these roads "continue to borrow" freight cars owned by other lines is the very practice discouraged by the mandated service rules which now require that borrowed cars immediately be returned to the owning lines.

*Ludlum.* There the Supreme Court "conceded that the immediate effect of the Commission's order will be to disrupt some established practices with respect to the handling and routing of freight cars, and on occasion cause serious inconvenience to shippers and railroads alike," 92 S.Ct. at 1948, but that this inconvenience was of less than great moment because of the disorganization and inefficiency already rampant in the railroad industry. Indeed, the Court specifically provided that "[i]f the Commission were thrusting these regulations upon an admittedly smoothly functioning transportation industry . . . the rationality of its action might well be open to question." 92 S.Ct. at 1948. Rather than expound, however, upon the structure, prosperity, efficiency, and stability of the carrier trucking industry, I will state merely that this is an area of delicate concern, and note that any guidelines specifically required for the trucking industry at variance with those promulgated by the I.C.C. must emanate from an authority endowed with more power than this court.

Regretfully, and with an absolute minimum of enthusiasm, I concur in the result reached by the majority.

TEITELBAUM, District Judge (dissenting).

I disagree with the view of the majority as to the application of the policies of the antitrust laws to the determinations made by The Interstate Commerce Commission in this case. I would therefore enjoin the enforcement of its order.[1]

I think the Commission, consciously or unconsciously but in either event conspicuously, failed to consider and weigh the anticompetitive implications of its order. In McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944) the Supreme Court exhaustively traced the history of the national transportation policy and concluded that, if "only in a qualified way", the policies of the antitrust laws are influential in the determination of the "public interest" in formulating motor carrier policy. The Court, mindful that "[T]he premises of motor carrier regulation posit some curtailment of free and unrestrained competition", resolved nonetheless that Congress had not authorized the Commission to ignore the policies of the antitrust laws. It concluded that the Commission was bound, "as an administrative matter",

" . . . to consider the effect of [the proposed merger][2] on competitors and on the general competitive situa-

---

1. Actually, I would go further and remand the case to the Commission, the precedent for which is ample—United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942) ; Justice Frankfurter writing in dissent in Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co., 351 U.S. 321, 76 S.Ct. 982, 100 L.Ed. 1220 (1956) ; Refrigerated Transport Co. v. United States, 297 F.Supp. 5 (D.C.N.D. Ga.1969) ; Freight Forwarders Institute v. United States, 263 F.Supp. 460 (D.C. S.D.N.Y.1967) ; and Ringsby Truck Lines, Inc. v. United States, 263 F.Supp. 552 (D.C.Colo.1967), appeal dismissed, National Small Shipments Traffic Conference, Inc. v. Ringsby Truck Lines, Inc., 389 U.S. 576, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968).

2. The fact that in *McLean Trucking* the Court was confronted with a case involving a merger does not limit its announced

principles since they obtain, more broadly, where the "public interest" needs to be assessed. See Cities of Statesville v. Atomic Energy Commission, 142 U.S.App. D.C. 272, 441 F.2d 962 (1969), in which Judge Leventhal, writing in dissent, observed that,
"The decisions of the Supreme Court and this court over a period of at least 25 years have evolved and defined a substantial jurisprudence making clear that the administration of federal regulatory statutes calling for determinations of the *public interest* establish the authority, and in some instances the duty, of the cognizant agency to take into account what has been aptly called the nation's 'fundamental national economic policy,' namely the principles of the antitrust laws." [Emphasis supplied]
In the case sub judice, involving, statutorily, 49 U.S.C. § 306(a), an assessment of the "public interest" is clearly needed.

tion in the industry in the light of the objectives of the national transportation policy."

In the case sub judice, the Commission expressly recognized its duty under the national transportation policy "to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers".[3] The difficulty is that having recognized its duty, the Commission proceeded to abdicate it. Neither its order nor its accompanying report makes any substantive reference to the transportation policy; it never translates it, *pro tanto,* into the policies of the antitrust laws; and most importantly it makes no findings of fact or conclusions of law relating to it, either expressly or implicitly.

The relationship between the policies of the antitrust laws and administrative decisions in regulated industries, early explored in *McLean Trucking,* has since increased in both importance and scope. In Northern Natural Gas Co. v. Federal Power Commission, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968) this complex relationship was extensively reviewed. There it was suggested that,

> " . . . it appears that the basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation in the form of antitrust law is the same—to achieve the most efficient allocation of resources possible."

Further, it was stated that the "theory of complementary regulation" was the basis for a legion of cases holding that administrative decisions in regulated industries "must, to some degree at least, accommodate the antitrust laws".[4] On the other hand, it was carefully pointed out by the court that regulatory agencies were not necessarily bound by the policies of the antitrust laws, and that if other applicable economic, social or political considerations were "found to be of overriding importance" the policies of the antitrust laws were subjugable. The conclusion of the court was that,

> "[I]n short, the antitrust laws are merely another tool which a regulatory agency employs to a greater or lesser degree to give 'understandable content to the broad statutory concept of the "public interest".' "[5]

The Commission's total disuse of that tool in this case I think, compels the enjoining of the enforcement of its order and further, I believe, the remanding of the case to the Commission for reconsideration in the light of the policies of the antitrust laws.

3. See Ace Doran Hauling & Rigging Co., Investigation of Operations, 108 M.C.C. 717 (Interstate Commerce Commission No. MC-C-4397, April 22, 1969) p. 732.

4. The cases cited for that proposition were: F.M.C. v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968) (ocean carriers); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (labor union); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) (natural gas distributors); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (banking); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S. Ct. 1246, 10 L.Ed.2d 389 (1963) (stock exchange); United States v. Radio Corporation of America, 358 U.S. 334, 79 S.

Ct. 457, 3 L.Ed.2d 354 (1959) (television communication); Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (railroads); United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) (insurance); McLean Trucking Co. v. United States, *supra* (trucking); and United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939) (agricultural cooperatives).

5. The obligation of a regulatory agency to consider the policies of the antitrust laws in determining the public interest was most recently reaffirmed in General Telephone Co. of Southwest v. United States, 449 F.2d 846 (5th Cir. 1971) p. 858, citing *McLean Trucking* and *Northern Natural.*